JOURNAL ENTRY AND OPINION
Jill Gilbert was born on September 8, 1995. Jill's parents are appellant Connie Reid and Kenneth Gilbert.[1] On October 14, 1998, the Cuyahoga County Juvenile Court awarded appellee Cuyahoga County Department of Children and Family Services (hereafter "CCDCFS") permanent custody over Jill. The mother's appeal presents questions as to the adequacy of the record upon which the lower court's judgment was based. Because our own review of the record causes us to have doubts as to the basis upon which the Juvenile Court rendered its judgment, we believe the judgment must be reversed and the cause remanded for further proceedings.
The record suggests that on or about January 3, 1997, sixteen-month-old Jill and a sixteen-year-old sibling were removed from their parents' custody. Jill was removed because she was diagnosed for "failure to thrive" while in her parents' care. On April 24, 1997, Jill and the sixteen-year-old child were committed to the temporary care and custody of CCDCFS. A five-year-old child was placed in the legal custody of appellant Reid subject to an order of protective supervision to CCDCFS.[2]
Jill was placed in a specialized foster home through the Health Hill Hospital for Children. Jill was subsequently found to suffer from Robinow's syndrome, a genetically transmitted lifelong condition with symptoms which may include developmental delays in height, growth, and cognitive functioning, as well as speech and hearing impairments. Both of Jill's parents are developmentally delayed and require a payee to assist them. The older sibling who was placed in temporary custody is said to be mildly retarded and hearing-impaired. CCDCFS apparently prepared a case plan for Jill's parents under which they visited with Jill and received other family services but, as will be noted shortly, that case plan is not in the record before us.
On February 2, 1998, CCDCFS filed its complaint in the Juvenile Court, alleging that these children were dependent and neglected. CCDCFS requested long-term foster care for the oldest child and permanent custody over the two youngest children, including Jill. CCDCFS simultaneously sought an order of pre-adjudicatory temporary custody over the children, and that request was granted on February 12, 1998. On May 27, 1998, the court terminated the temporary custody order over the oldest child and committed him to the long-term foster care of CCDCFS. The court continued the matter as to the two youngest children.
At a hearing before a juvenile court magistrate on September 16, 1998, Jill was adjudicated to be a dependent child and the matter proceeded immediately to a dispositional hearing. On October 1, 1998, the magistrate decided that CCDCFS should have permanent custody over Jill.[3] No objections having been filed, the Juvenile Court approved the magistrate's decisions on October 14, 1998 and ordered Jill to be committed to the permanent custody of CCDCFS.
The mother's appeal presents six assignments of error for consideration.[4] Because the first and third assignments of error challenge the correctness of the order granting permanent custody, we will address them together. They assert:
 I. THE COURT FAILED TO FIND ONE OR MORE FACTORS OF R.C. 2151.414
(E) WERE DETERMINED BY CLEAR AND CONVINCING EVIDENCE. THERE IS NOT SUFFICIENT EVIDENCE TO PROVE THE PARENTS HAVE FAILED OR REFUSED TO PROVIDE BASIC NECESSITIES, REGULAR SUPPORT, VISIT OR COMMUNICATE WITH THE CHILD WHEN ABLE TO DO SO OR BY OTHER ACTIONS, HAS SHOWN AN UNWILLINGNESS TO PROVIDE AN ADEQUATE HOME FOR THE CHILD.
 III. THE COURT GRANTED THE MOTION FOR CUSTODY WHICH WAS NOT IN THE BEST INTEREST OF THE CHILD PURSUANT TO R.C. 2151.414 (B).
We sustain these assignments of error.
The overriding goal in any child custody case is to reach a disposition that is in the child's best interests. See In reHitchcock (1996), 120 Ohio App.3d 88; In re Awkal (1994),95 Ohio App.3d 309. The question in this case is whether the record before us is adequate to sustain the permanent custody disposition the lower court rendered. We begin by reviewing the statutory framework for such a disposition and then proceed to consider whether this record will support the court's judgment.
CCDCFS initiated this proceeding by filing a complaint seeking permanent custody over dependent children pursuant to R.C.2151.27. R.C. 2151.35 establishes the procedure to be followed when a trial court determines the disposition of a child who has been adjudicated dependent. Under R.C. 2151.353 (A)(4) and R.C.2151.414 (B), the juvenile court is authorized to grant permanent custody to the agency if, from clear and convincing evidence presented at a hearing, the court determines (1) in accordance with R.C. 2151.414 (E) that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, and (2) in accordance with R.C.2151.414 (D) that the permanent commitment is in the best interest of the child. Under R.C. 2151.353 (H), a dispositional order under R.C. 2151.353 (A) that removes a child from the home must include the finding of facts required by R.C. 2151.419
showing the agency made reasonable efforts to prevent removal of the child from the home, to eliminate the continued removal of the child from the home, or to make it possible for the child to return to the home. As part of the dispositional order, R.C.2151.353 (D) requires the court to journalize the case plan prepared pursuant to R.C. 2151.412.
In this case, the trial court approved the magistrate's decision which declared, in part:
 The magistrate having received the appropriate reports, finds that the child's continued residence in or return to the home would be contrary to her best interest and welfare. The magistrate finds that reasonable efforts were made to prevent placement and/or to make it possible for the child to return to her home. For findings as to services provided by Cuyahoga County Department of Children and Family Services and why they were not successful see the case plan. The magistrate finds that the child cannot be placed with a relative because relatives of the child are unwilling to provide care for the child. Upon further consideration, the magistrate finds by clear and convincing evidence that it is in the best interest of the child to grant permanent custody to Cuyahoga County Department of Children and Family Services and the child is not abandoned or orphaned. The magistrate further finds that the child cannot be placed with her parent(s) for the following reasons: the parent(s) have failed or refused to provide basic necessities, regular support, visit or communicate with the child when able to do so or by other actions, has shown an unwillingness to provide an adequate permanent home for the child.
Because this is the decision the trial court approved when it granted the request for permanent custody, we begin by reviewing what was before the trial court.
The magistrate explicitly identified a case plan to explain that CCDCFS made reasonable efforts to avoid placement but that those efforts, and by implication the parents' responses to those efforts, were "not successful." As the mother points out in her brief, however, the only case plan in the record is for a different family, not for this family. CCDCFS does not dispute that a case plan pertaining to the family in the case at bar is not in the record. We have no reason to doubt, moreover, that the record transmitted to us is the same record that was before the lower court. Nor has CCDCFS indicated that the absence of this family's case plan from the record is an error subject to correction under App.R. 9.
We, of course, are restricted to the record of the proceedings before the trial court. See State v. Ishmail (1978), 54 Ohio St.2d 402. That record shows the magistrate predicated the decision to grant permanent custody to CCDCFS on the parents' unsuccessful completion of their case plan which lack of success made it impossible to return Jill to her home. But no case plan for this family is in the record, and the only case plan before the Juvenile Court related to a different family. This record on its face could provide no foundation upon which the Juvenile Court could confirm the correctness of the magistrate's decision.
CCDCFS asks us to ignore this obvious defect on the grounds that the mother did not file objections to the magistrate's decision. Juv.R. 40 (E)(3)(a) requires a party to file written objections to a magistrate's decision within fourteen days of its filing. Juv.R. 40 (E)(3)(b) states:
 Objections shall be specific and state with particularity the grounds of objection. * * * Any objection to a finding of fact shall be supported by a transcript of all the evidence submitted to the magistrate relevant to that fact or an affidavit of the evidence if a transcript is not available. A party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule.
CCDCFS argues that because the mother did not object to the magistrate's findings pursuant to Juv.R. 40 (E)(3), she cannot be heard to complain on appeal that it was error for the juvenile court to accept the magistrate's findings. But Juv.R. 40 (E)(4) authorizes the juvenile court to reject a magistrate's decision containing an error or defect even if no objections have been filed. Juv.R. 40 (E)(4) states:
 The magistrate's decision shall be effective when adopted by the court as noted in the journal record. The court may adopt the magistrate's decision if no written objections are filed unless it determines that there is an error of law or other defect on the face of the magistrate's decision. (Emphasis added.)
In the case at bar, the case plan was expressly identified as a basis for the magistrate's decision to grant permanent custody. CCDCFS does not dispute that the case plan established pursuant to R.C. 2151.412 was material to the lower court's judgment. Indeed, R.C. 2151.353 (D) requires the court to journalize the case plan as part of the dispositional order, but this record does not contain any journalized case plans. We can only conclude that this family's case plan was not before the Juvenile Court. This defect in the magistrate's decision was apparent on the face of the materials submitted to the court for review, and the absence of objections does not insulate this obvious error from review.
CCDCFS alternatively urges us to rely on the transcript of the hearing before the magistrate during which various references were made to the family's case plan. Our review of the transcript, however, gives us even less confidence that the judgment rendered below was correct. According to the testimony of Tamika Moses, who appears to have been at least the third CCDCFS social worker assigned to this matter, the parents completed the majority of their case plan including services for family preservation, parent education, case management including visitation, substitute child care, anger management, and psychological examination. (Tr. 56-61, 69, 89-90.) Moses testified on direct examination that the father did not complete sex abuse counseling. (Tr. 61-63.) Moses admitted on cross-examination, however, that the original case plan did not even require the father to receive counseling for sex abuse and that it was not until an amendment dated September 16, 1998 —the date of the hearing before the magistrate — that the case plan supposedly required the father to receive sex abuse counseling. (Tr. 77-79.) In other words, the parents completed everything in the original case plan. And we have no copy of any amended case plan.
We have serious doubts, therefore, as to whether the evidence showed that the family was "not successful" in completing their case plan. CCDCFS nevertheless insists that the clear and convincing evidence adduced before the magistrate was sufficient to show that Jill could not be placed with one of her parents within a reasonable time or should not be placed with either parent and that the permanent commitment with CCDCFS was in Jill's best interest. The evidence CCDCFS offers does not compel the conclusion it urges.
Before it could find that Jill could not be placed with either parent within a reasonable period of time or should not be placed with the parents, the court had to find clear and convincing evidence of one or more of the factors enumerated in R.C.2151.414 (E). See In re William S. (1996), 75 Ohio St.3d 95
(construing former R.C. 2151.414). In this case, the court identified R.C. 2151.414 (E)(4) as the applicable factor:
 The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child * * *.
In determining the best interests of the child, R.C. 2151.414
(D) at the time in question permitted the court to consider all relevant factors, including but not limited to the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
According to R.C. 2151.414 (C), "a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child."
Seeking permanent custody here, CCDCFS relied on social worker Moses who testified that the parents had participated in two separate family preservation services and two separate parent education courses, in seeming compliance with the case plan presented to them. CCDCFS tells us the father failed to participate in anger management counseling or sexual abuse counseling. (Appellee's Brief at 10.) Moses testified, however, that the father did complete anger management counseling. (Tr. 61.) And while Moses testified that the father refused sex abuse counseling services, that, as noted previously, does not appear to have even been a component of the case plan at any time before the September 16, 1998 hearing.
CCDCFS relies on appellant Reid's "failure to make timely progress on her case plan" as evidence of her "unwillingness to provide an adequate permanent home" under R.C. 2151.414 (E)(4). But as noted previously, social worker Moses testified that the parents had completed the case plan objectives for family preservation, parent education, case management including visitation, substitute child care, anger management, and psychological examination. (Tr. 56-61, 69, 89-90.) Moses summarily concluded that while the parents completed their case plan objectives, they did not benefit from the plan. (Tr. 112-113.) Additionally, Moses criticized the infrequency of the parents' visitation (Tr. 63-65), although she acknowledged that visitation typically becomes restricted once the agency files for permanent custody. (Tr. 71-72.) Moses had no concerns about the interaction between Jill and her parents. (Tr. 66.)
Moses ultimately opined that the parents would be unable to meet Jill's special medical needs. (Tr. 66-69.) She admitted on cross-examination, however, that she had not personally observed anything that would indicate that appellant Reid would not be able to take care of Jill's developmental needs. (Tr. 89.) Indeed, Moses would not say the parents showed an "unwillingness" to respond to Jill's special needs:
 Q. You testified something to the effect of the parents being offered special services and not willing to go along with that, is that correct?
A. I didn't say they weren't willing.
Q. Okay. Well, what exactly did you say?
 A. I said they were offered it but they never mentioned it afterwards.
(Tr. 82-83.) Even then, Moses conceded on re-direct examination that she was "not sure" whether the parents had been offered the opportunity to be involved in Jill's special medical appointments. (Tr. 115-116.)
The remaining evidence offered by CCDCFS does not significantly advance the agency's contention that Jill could not or should not be placed with either parent within a reasonable period of time or that permanent placement was in Jill's best interest. Dr. Thomas Anuszkiewicz found appellant Reid had a history of neglect of children, an occupational problem, and mild mental retardation. (Tr. 3.) Yet he offered no reason to believe appellant had demonstrated a lack of commitment to Jill or that Jill's needs could not be met unless permanent custody were granted. Patricia Klanac, a Home Therapist in the MetroHeatlh Parenting Program, testified that while the parents initially received services in April 1997, they resisted participation out of anger and did not return until June 1997. (Tr. 119-120.) But while Klanac expressed her concerns about returning Jill to her parents, she did not see anything that caused her to believe that Jill should not be returned to her parents. (Tr. 140.)[5]
CCDCFS criticizes the parents for not following through with the services offered by Health Hill Hospital for Children, but the testimony by Ronna M. Johnson suggests that a persistent failure of communication by CCDCFS may have been a contributing factor for the parents' misunderstanding about the role of Health Hill and the services it could offer. (Tr. 183-192.) Jill's guardianad litem recommended that she be placed in the permanent custody of CCDCFS, but even the guardian ad litem misidentified Jill's father.
We have serious doubts whether this evidence could meet the standard of clear and convincing evidence required by R.C.2151.414 (B). But even putting aside the reservations we have about the adequacy of this evidence, the record before the trial court contained an obvious defect in that there was no case plan before the court which showed that this family had been unsuccessful in completing the case plan and that Jill could not be placed with either parent within a reasonable period of time. This uncorrected defect, coupled with other doubts this record presents, prevents us from being able to say with confidence whether the lower court correctly granted permanent custody.
Given the state of the record, we decline to speculate on whether the lower court would have granted permanent custody. As the Ohio Supreme Court has observed:
 A reviewing court, even though it must conduct its own examination of the record, has a different focus than the trial court. If the trial court does not consider all the evidence before it, an appellate court does not sit as a reviewing court, but, in effect, becomes a trial court.
Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 360. We therefore believe the better course is to have the Juvenile Court reexamine this record, and correct it, so that it can make an informed determination in the first instance. The court may find it more efficient to simply conduct a new hearing. Consistent with that mandate, we sustain the mother's first and third assignments of error.
The mother's second assignment of error asserts:
 II. THE EXPERT'S OPINION MUST BE BASED ON A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY BEFORE ADMISSION.
This contention lacks merit.
The mother complains that expert witness Dr. Thomas Anuszkiewicz did not express his opinions to a reasonable degree of scientific certainty. The mother did not object, however, to the admissibility of Dr. Anuszkiewicz's testimony either at the hearing before the magistrate or in objections to the trial court pursuant to Juv.R. 40 (E)(3). The mother does not identify, moreover, any particular testimony by this witness which was wrongly admitted and prejudicial to her. She has accordingly failed to exemplify any error, so we overrule her second assignment of error.
The mother's fourth assigned error states:
 IV. THE HERESY [SIC] TESTIMONY OF THE COUNTY WORKERS AND SERVICE PROVIDERS IS INADMISSABLE [SIC] AND REVERSIBLE ERROR TO GRANT CHANGE OF CUSTODY BASED ON SUCH TESTIMONY.
The mother complains that testimony by social worker Tamika Moses concerning reports in the case file which pre-dated her March 1998 assignment to the file was inadmissible hearsay. We disagree. The mother does not identify any particular testimony by this witness which constituted inadmissible hearsay. In any event, hearsay evidence may be admitted at a dispositional hearing. See R.C. 2151.35 (B)(2)(b); Juv.R. 34 (B)(2). See, also,In re Baby Girl Baxter (1985), 17 Ohio St.3d 229, 233. The mother's fourth assignment of error is accordingly overruled.
For her fifth assigned error, the mother asserts:
 V. THE COURT FAILED TO MAKE FINDINGS OF FACT AND THE REFERENCE TO A CASE PLAN IS INSUFFICIENT TO CLEARLY STATE THE FINDINGS OF FACT.
The mother complains that the court's judgment entry is inadequate in form because it does not contain findings of fact and conclusions of law. But R.C. 2151.353 (A)(4) states, in part: "If the court grants permanent custody under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding." (Emphasis added.) See, also, Juv.R. 40 (E)(2). No request for findings of fact or conclusions of law appears in the record. Consequently, the court was under no obligation to file a written opinion setting forth its findings of fact and conclusions of law. The mother's fifth assigned error is without merit.
Her last assignment of error contends:
 VI. THE COUNTY FAILED TO ACCOMMODATE THE APPELLANT'S HANDICAP DISABILITIES OF BEING DEVELOPMENTALLY DELAYED IN VIOLATION OF THE AMERICAN DISABILITY ACT AND THE OHIO HANDICAP DISABILITY STATUTE R.C. 2114.99, AND THE HANDICAP REHABILITATION ACT.
The mother complains that CCDCFS failed to accommodate her circumstances and therefore failed to make reasonable efforts to prevent removal of the child from the home, to eliminate the continued removal of the child from the home, or to make it possible for the child to return to the home, as R.C. 2151.419
required. The lower court approved the magistrate's finding that CCDCFS had made reasonable efforts as evidenced by the family's case plan. Because the record does not contain this family's case plan, however, we are unable to say whether CCDCFS failed to make reasonable efforts and the mother has not shown anything to the contrary. Accordingly, we overrule her sixth assignment of error.
Because we sustain the mother's first and third assignments of error, we reverse the judgment and remand the matter for further proceedings consistent with this opinion.
This cause is reversed and remanded.
It is, therefore, ordered that appellant recover of appellee her costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY. J. and ANNE L. KILBANE, J. CONCUR.
 __________________________ DIANE KARPINSKI PRESIDING JUDGE
[1] Kenneth Gilbert is not a party to this appeal.
[2] The record before us does not include any legal filings associated with the initial removal of Jill or her siblings.
[3] In a separate decision, the magistrate decided that the oldest child would remain in the long-term foster care of CCDCFS. In a third decision, the magistrate granted the oral motion by CCDCFS to remove the younger child from the complaint for permanent custody and ordered that child to be placed in appellant Reid's custody.
[4] CCDCFS filed a motion to dismiss the mother's appeal on the grounds that under Juv.R. 40 (E)(3)(b), the mother's failure to file objections to the magistrate's decision bars her from assigning as error on appeal the juvenile court's adoption of the magistrate's findings of fact or conclusions of law. Although the mother's failure to file objections may restrict her ability to raise certain issues on appeal, it does not require dismissal of the appeal. We therefore deny CCDCFS's motion to dismiss the appeal.
[5] Klanac apparently observed the parents with Jill for only one two-hour observation period because that was all CCDCFS would authorize. The transcript at p. 152 records this exchange:
 Q. You mean your entire program is then based on what the Department of Human Services authorizes then?
A. Exactly.
Q. If they —
A. This is a taxpayer's issue.
* * *
Q. Can't you request any more visits?
A. We do on all of our cases.
Q. And the agency turns you down?
A. (Inaudible) The child was not in a home.
 Q. And that was their only reasoning for turning you down?
A. Money. Money is the real issue.